**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHEMETALL US INC., | Civil Action No.: 16-780 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| DONALD LAFLAMME and CORAL CHEMICAL CO., | |
| Defendants. | |

**LINARES**, District Judge.

This matter comes before the Court by way of an application for a preliminary injunction by Plaintiff Chemetall US Inc. ("Chemetall") to enforce non-compete and non-solicitation clauses against its former employee Defendant Donald LaFlamme ("LaFlamme"). Oral argument was heard in this matter on February 29, 2016. After considering the parties' submissions and the arguments at the February 29 hearing, Plaintiff's application for a preliminary injunction is granted in part and denied in part.

## I. BACKGROUND

The following facts relevant to the issue before the Court are undisputed.[1]

---

[1] Chemetall supported its application for an injunction ("Pl.'s Mot.") with a declaration of Mark Brunner, the Vice President of Sales at Chemetall, and a declaration of Louis Cona, a Senior Forensic Technician at Complete Discovery Source, Inc. *See* Decl. of Mark P. Brunner, dated Feb. 15, 2016 ("Brunner Decl."); Decl. of Louis Cona, dated Feb. 15, 2016 ("Cona Decl."). LaFlamme and Defendant Coral Chemical Co. ("Coral") supported their opposition ("Defs.' Opp'n") with declarations from LaFlamme as well as from Coral's Vice President of Sales and Marketing, Peter Dority. *See* Decl. of Donald LaFlamme in Supp. of Defs.' Mot. to Stay This Matter or Transfer Venue and in Opp'n to Pl.'s App. for Injunctive Relief, dated Feb. 25, 2016 ("LaFlamme Decl."); Declaration of Peter Dority, dated Feb. 25, 2016 ("Dority Decl."). Prior to the February 29 hearing, Chemetall submitted an additional declaration of Mark Brunner and a declaration of Kenneth

Chemetall "is a Delaware corporation with its principal place of business in New Jersey." Dority Decl., Ex. A (Coral S.D. Ind. Compl.), ¶ 5. It is a chemical company that "offers 1500 specialized products and systems for more than 30 industries, including metal fabrication, aerospace, agricultural, appliance microelectronics, architectural, automotive, coil, and other surface treatment-related markets." Defs.' Opp'n at 5 n.3; Dority Decl., Exhibit C (excerpt from Chemetall's website). These "products and services are offered to non-metal industries such as food, pharmaceutical, plastics recycling, pulp and paper, latex, and transportation industries." *Id.*

Coral is "an Illinois corporation with its principal place of business in Zion, Lake County, Illinois." Dority Decl., Ex. A (Coral S.D. Ind. Compl.), ¶ 3. "Coral is a manufacturer of industrial chemical products," and its "products are used on aluminum beverage cans, computer disks, office furniture, lawn and garden equipment, as well as in the automotive, appliance and many other industries." *Id.* ¶ 6. Coral "directly competes with Chemetall in the area of chemical surface treatments for metals," and "both companies operate in North America and target customers in the automotive and appliance industries." Brunner Decl. ¶ 40.

LaFlamme, an Indiana resident, was hired by Chemetall in May 2010 as a "Technical Sales Manager [("TSM")] for the South Central Region, effective June 2, 2010." LaFlamme Decl., Ex. 1 (executed offer letter ("Offer Letter")), at 1. As part of his employment, LaFlamme was to "receive a base salary of $12,500 per month . . . ." *Id.*, ¶ A. He was "provided the opportunity to earn additional compensation based on [the] gross margin dollars [his] territory . . . generate[d]."

---

Dyman, Chemetall's Business Manager for the appliance segment, in response to Defendants' opposition. *See* Supp. Decl. of Mark P. Brunner, dated Feb. 26, 2016 ("Supp. Brunner Decl."); Decl. of Kenneth Dyman, dated Feb. 27, 2016 ("Dyman Decl."). The declarations in support of LaFlamme's position and additional arguments at the February 29 hearing confirm certain statements made by Chemetall, dispute some, and do not respond to others. If a statement was confirmed by Defendants or no conflicting response was provided, that statement is undisputed for purposes of this Court's analysis herein.

*Id.* Thus, at least initially, LaFlamme was compensated through a base salary with additional compensation tied to the performance of his territory.

In conjunction with executing the Offer Letter, LaFlamme executed an "Agreement in Consideration of Employment," referred to herein as the "Agreement." *Id.*, Ex. 1. The Agreement provided that the

> Employee agrees that, for the period of one (1) year from the date of termination of the Employee's employment (regardless of whether Employee's termination is voluntary or involuntary, or with or without cause): (a) Employee will not directly or indirectly, whether as sole proprietor, partner, venturer, stockholder, director, officer, employee or agent, engage or participate in any employment or activity intended to or which does compete with Chemetall within any territory to which Employee was assigned by Chemetall during the two (2) years prior to the termination of Employee's employment with Chemetall; and (b), Employee is expressly restricted from, directly or indirectly, either personally or in a supervisory or consulting capacity, canvassing, soliciting or accepting business from or selling competitive products to any of Chemetall customers or prospective customers. For purposes of this Agreement, the term "customers" includes, but is not limited to, any other person or entity which has purchased any Chemetall product within the two (2) years prior to the termination of Employee's employment; or any prospective customer identified or contacted by Employee or any other representative of Chemetall within the two (2) years prior to the termination of Employee's employment. Moreover, Employee will not himself or herself, nor will he or she permit or give any other person, firm or corporation the right or permission to disclose to any person, firm or corporation the names, addresses or requirements of any such customer, as that term is defined herein, or request or advise any of the said customers to withdraw or cancel any of their business with Chemetall.

*Id.*, Ex. 1 (Agreement), § 7 ("Competition"). The Agreement further provided that the

> Employee acknowledges that the restrictions on his or her activities during his/her employment with Chemetall, and following the termination of employment with Chemetall, do not prevent Employee from using generic skills learned while employed by Chemetall in any business or activity which is not in competition with Chemetall - including the business of selling products in the chemical field - so long as Employee does not engage in competition with Chemetall in the relevant territory or with Chemetall customers.

*Id.* With respect to non-solicitation of customers and employees, the Agreement provided that the

> Employee shall not during the course of his/her employment with Chemetall and/or for one (1) year following the termination of Employee's employment with

3

Chemetall (regardless of whether Employee's termination is voluntary or involuntary, or with or without cause) directly or indirectly, whether as sole proprietor, partner, venturer, stockholder, director, officer, employee or agent, solicit, attempt to solicit, assist another to solicit customers of Chemetall, or in any other way, attempt to influence customers of Chemetall to alter or terminate their business relationships with Chemetall.

* * *

Moreover, Employee shall not, during the course of his/her employment with Chemetall and for one (1) year following the termination of Employee's employment (regardless of whether Employee's termination is voluntary or involuntary, or with or without cause), induce or influence, or attempt to induce or influence, any person engaged as an Employee, Independent contractor or agent of Chemetall to terminate his/her relationship with Chemetall; canvas, solicit, accept the employment of or otherwise engage or use the services of any person engaged as an employee, independent contractor or agent of Chemetall; or permit or give any other person, firm or corporation any right, permission or information which would in any way enable it to do so.

*Id.*, § 8 ("Solicitation"). LaFlamme entered into the Agreement prior to beginning work at Chemetall. *See id.*, at 8 (executed on May 18, 2010); *see also* Hr'g Tr. (Feb. 29, 2016) ("Hr'g Tr.") at 30:18-24. The Agreement also contained choice of law and forum selection provisions in favor of New Jersey law and New Jersey courts. LaFlamme Decl., Ex. 1 (Agreement), § 13 ("Applicable Law").

Chemetall TSMs are required "to have an education or background in engineering or chemistry, and/or commensurate technical or industry experience." Brunner Decl. ¶ 9. This requirement is to ensure that "all Chemetall TSMs understand how the proprietary technology used in Chemetall's products work based on the unique chemical compositions and formulations used in those products." *Id.* LaFlamme had 27 years of "specialty chemical" experience prior to joining Chemetall. LaFlamme Decl. ¶ 15. Nevertheless, LaFlamme's Offer Letter stated that as a Chemetall TSM, "one of [his] first important tasks will be the learning of the superior Chemetall line of products." *Id.*, Ex. 1 (Offer Letter), at 1.

4

At some point in his Chemetall employment, LaFlamme was promoted to Senior Technical Sales Manager. *See* Brunner Decl. ¶ 21; LaFlamme Decl., Ex. 2 (LaFlamme Resignation Letter). And, during his Chemetall employment, he "had responsibility for certain large and strategically important national accounts."[2]  Brunner Decl. ¶ 21.

In December 2015, Chemetall altered the compensation formula for sales representatives. *See* LaFlamme Decl. ¶ 21; *see also id.*, Ex. 2 (LaFlamme Resignation Letter) ("I have recently expressed my concerns with the new sales compensation program for 2016."). As a result of the change in compensation formula for sales representatives, LaFlamme resigned from Chemetall on January 12, 2016. *Id.*, Ex. 2 (LaFlamme Resignation Letter).  As part of his resignation, he gave two weeks' notice, indicating that his last day at Chemetall would be January 29, 2016. *Id.*  Mr. Brunner replied to LaFlamme's resignation letter via email "wish[ing] [him] well whatever you choose to do going forward." *Id.*, Ex. 2 (Email from Brunner to LaFlamme, Jan. 12, 2016). LaFlamme did not inform Chemetall that he was going to work for Coral even though he was in contact with Coral before he resigned and clearly negotiated his employment with Coral prior to leaving Chemetall.[3]  *See* Brunner Decl. ¶ 31; Cona Decl. ¶ 9 (According to the phone records of LaFlamme's company-issued phone, a message from December 6, 2015 read in part: "Coral's attorney looked at my contract and non compete and he believes the non compete is no longer

---

[2] While LaFlamme argues that he developed many of his customer relationships prior to joining Chemetall (*see* LaFlamme Decl. ¶ 18), he does not dispute that while at Chemetall, he served accounts that were important for Chemetall's business.

[3] LaFlamme disputes that he told Chemetall that he may not continue to work in the industry (*see* LaFlamme Decl. ¶ 35), but, he does not assert that he informed Chemetall that he was planning on working for a Chemetall competitor and had already begun discussions with them when he resigned. He says only that he "made no secret about [his] plan to continue working in the specialty chemical industry." *Id.* ¶ 36.

5

valid."); Dority Decl. ¶ 11 (confirming that Coral reviewed LaFlamme's Chemetall restrictions prior to offering LaFlamme employment).

After LaFlamme resigned, but before his last day, "Chemetall cut off [his] access to certain portions of its network." LaFlamme Decl. ¶ 26; *see also id.* ¶ 38; Hr'g Tr. at 41:12-22 (LaFlamme Counsel: "[T]hey were the ones who shut him out of the system in the first place . . . ."). Subsequently, LaFlamme copied Chemetall information onto USB drives. *See* LaFlamme Decl. ¶ 38; Hr'g Tr. at 41:12-22 (LaFlamme Counsel: "[S]o he brought in his own USB drives in order to move data from one place to another . . . .").[4]

LaFlamme's last day at Chemetall was Friday, January 29, 2016. LaFlamme Decl. ¶¶ 26, 51. His first day at Coral was Monday, February 1, 2016. *Id.* ¶¶ 27, 51. LaFlamme was "assigned no geographic territory" as part of his employment with Coral. *Id.* ¶ 15.

Three days after his last day with Chemetall (February 3, 2016), Chemetall sent LaFlamme a letter reminding him of his noncompetition, nonsolicitation, and confidentiality obligations. *See* Brunner Decl., Ex. C. Under the Agreement, LaFlamme's obligations with respect to protecting Chemetall's confidential information during and after employment also includes that, "[u]pon termination of Employee's employment, or at any other time upon request by Chemetall, Employee shall immediately return to Chemetall all [Chemetall confidential and other business] documents, notes and copies." LaFlamme Decl., Ex. 1 (Agreement), ¶ 6 ("Chemetall Property and Its Return"). On February 6, 2016, after discovering that LaFlamme was employed by Coral, Chemetall's legal counsel sent letters to LaFlamme and Coral enclosing copies of the Agreement

---

[4] LaFlamme asserts that he copied the files in order to serve his customers in his last two weeks and that the data he copied was "not confidential Chemetall data" (*see* LaFlamme Decl. ¶¶ 38-39), but he does not dispute that he did copy files as a work around to Chemetall restricting his access to its network.

and outlining its position regarding LaFlamme's contractual obligations. *See* Brunner Decl., Exs. D, E. Chemetall demanded that LaFlamme provide, by February 17, written assurances that LaFlamme would honor his obligations under the Agreement. *Id.*, Ex. D. Chemetall informed LaFlamme that if he failed "to provide the written assurances and representations demanded . . . , [it] intend[ed] to commence an action against [him] . . . ." *Id.* Rather than respond to the letters, on February 11, 2016, Coral and LaFlamme filed a Declaratory Judgment Action against Chemetall in the Southern District of Indiana. *See id.*, Ex. F.

On February 12, 2016, Coral General Counsel, Robert Shupenus, sent a letter to Chemetall's counsel on behalf of Coral and LaFlamme asserting Coral's position that the Agreement was unenforceable, and that LaFlamme was bound by no restrictions. Dority Decl., Ex. B. Mr. Shupenus acknowledged in the February 12 letter that the Agreement contained a choice-of-law provision, and that New Jersey law allows the narrowing of overly broad non-competition and non-solicitation restrictions in lieu of finding whole provisions unenforceable. *Id.* at 2. Mr. Shupenus nevertheless asserted his position that, under an Indiana court's choice-of-law analysis, the contractually designated law (New Jersey) would be inapplicable as it was inconsistent with Indiana law. *Id.; see also id.*, Ex. E (Coral's Mem. of Law in Support of Emergency Mot. for Temporary Restraining Order and Prelim. Injunction ("Coral's TRO Mem.")), at 16 ("The Agreement includes a choice of law provision favoring application of New Jersey law; however, Indiana's choice of law principles render this provision unenforceable, which in turn renders the restrictive covenants unenforceable as well."). On February 15, 2016, Chemetall emailed Mr. Shupenus and Coral's outside counsel a copy of the papers that Chemetall intended to (and did) file with this Court seeking a TRO and preliminary injunction against LaFlamme and Coral. *See* Decl. of Robert I. Steiner, dated Feb. 16, 2016 ("Steiner Decl.").

Despite his awareness of the dispute over the enforceability of the restrictions in the Agreement, on or about February 16, 2016—only two weeks after his last day at Chemetall, LaFlamme visited a Chemetall customer, GE Roper, at a Kentucky plant using a Chemetall vendor badge. Dyman Decl. ¶¶ 4-8. LaFlamme has not disputed that this was a customer that he previously serviced on behalf of Chemetall or that this is an important customer for Chemetall. *See id.* ¶ 3; Supp. Brunner Decl. ¶ 5. With respect to LaFlamme's use of Chemetall's badge to access the GE plant on behalf of Coral, LaFlamme's counsel argued—despite *LaFlamme's* obligations with respect to Chemetall's property, that "[i]f this was such an issue, frankly, your Honor, Chemetall should have deactivated his badge six weeks ago or seven weeks ago when he gave notice. . . . It slipped through the cracks." Hr'g Tr. at 64:5-13.

On February 24, 2016, after this Court had issued a TRO and set a hearing date related to Chemetall's application for a preliminary injunction, Coral filed a motion for emergency relief in the Southern District of Indiana seeking to restrain Chemetall from proceeding with the present lawsuit. *See* Dority Decl., Ex. E (Coral's TRO Mem.). On February 25, 2016, the Indiana Court issued an Order denying Coral and LaFlamme's emergency motion. The Indiana court stated that "[a]ll of the plaintiffs' arguments—both on the merits and on the question of the proper forum—can be advanced in connection with that hearing [before this Court]." ECF No. 15, Ex. A. The Court's denial of relief to Defendants was without prejudice as "to the merits of the arguments." *Id.*

Finally, with respect to Chemetall's property and confidential information, LaFlamme asserts that "[u]nder Coral's instructions, [LaFlamme] boxed up and returned all Chemetall property after resigning and returned all Chemetall property on February 15, 2016." LaFlamme Decl. ¶ 48. He also asserts that, "[o]ther than copying material delivered from outside Chemetall

8

[that he] believes [he] can lawfully possess," he has "nothing of a confidential or proprietary nature belonging to Chemetall." *Id.* ¶ 65. He further asserts that he "did not download, transfer, or steal anything rightfully belonging to Chemetall, confidential or otherwise." *Id.* ¶ 38. He admits that he did copy some information onto USB drives, but claims that it was only material "to support my customers during my last weeks of employment." *Id.*

Contrary to these statements, LaFlamme's counsel admitted at the February 29 hearing that the USB drives contain information that would be required to be given back to Chemetall as part of an order to preserve Chemetall's confidential information. LaFlamme's counsel further acknowledged that the USB drives had yet to be returned to Chemetall. The following exchange occurred at the February 29 hearing:

> THE COURT: So what is wrong then with an order prohibiting him from using any of the confidential information of Chemetall?
>
> MR. SALOMAN: That is ice in the wintertime, your Honor, and I think we are comfortable with that. He hasn't done it. He's not planning on doing it. He won't do it. He can't do it, and if you order –
>
> THE COURT: Did he physically remove anything from the company that needs to be put back as part of that order?
>
> MR. SALOMAN: The copy that's on the flash drives is all I know, and I don't think anything has actually been physically removed. It may have been copied. . .
>
> THE COURT: Where is the flash drive? Was the flash drive given back to Chemetall?
>
> MR. SALOMAN: We have it, your Honor, and it has been secured. And if it has to be given back, we will give it back. It is not an issue.

Hr'g Tr. at 41:8-20.

## II.   LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *HR Staffing Consultants LLC v. Butts*, No. 15-2357, 2015 WL 5719655, at *2 (3d. Cir. Sept. 30, 2015) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (same).

## III.   CHOICE OF LAW

Before addressing the preliminary injunction elements, the Court must address the parties' choice of law dispute.   Chemetall argues that New Jersey law should apply as LaFlamme is bound by the choice-of-law clause in the Agreement.   *See* Pl.'s Mot. at 18 n.2.   The choice-of-law provision provides that "[t]his Agreement shall be construed and governed by the laws of the State of New Jersey."  LaFlamme Decl., Ex. 1 (Agreement), § 13 ("Applicable Law").   LaFlamme, on the other hand, argues that Indiana law should apply "because Indiana has an overwhelming connection to the facts, allegations, and outcome of this case."  Defs.' Opp'n at 15.[5]  LaFlamme also argues that "Application Of New Jersey Law To The Agreement Violates A Fundamental Public Policy Of Indiana," and that "Indiana Has A Far Greater Material Interest Than New Jersey Because An Indiana Resident Will Lose His Job Due To A Draconian And Unenforceable Anti-Competitive Agreement."  *Id.* at 16, 18.

LaFlamme acknowledges that "[w]hen resolving a conflict-of-laws issue in a diversity action such as this one, a federal court must apply the choice-of-law principles of the forum state, which is New Jersey."  *Id.* at 15 (citing *Klaxon Co. v. Stentor Elec. Mfg., Co., Inc.*, 313 U.S. 487, 496–97 (1941)); *see also Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007).  Under New

---

[5] At the February 29 hearing, LaFlamme argued that the Agreement should not be enforced because it was a contract of adhesion.  *See* Hr'g Tr. at 23:24-24:3.  However, LaFlamme acknowledged that the contract was entered into prior to accepting employment with Chemetall.  *Id.* at 30:18-24. No facts have been presented by LaFlamme indicating any special circumstances beyond a typical employment process to support such an argument.

Jersey law, "when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will [ordinarily] uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992); *see also Abulkhair v. Citibank and Assocs.*, 434 F. App'x 58, 61 n.4 (3d. Cir. 2011); *Homa v. Am. Express Co.*, 558 F.3d 225, 288 (3d Cir. 2009) (quoting *Instructional Sys.* and emphasizing "if it does not violate New Jersey's public policy"). Thus, under New Jersey law, absent a conflict with *New Jersey* public policy,

> the law of the state chosen by the parties will apply, unless either:
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Instructional Sys.*, 614 A.2d at 133 (citing Restatement (Second) of Conflicts of Laws § 187 (1969)).

The Court first notes that the parties agree that an actual conflict exists between the law that Chemetall (New Jersey) asserts should be applied and the law that Defendants (Indiana) seek to have applied. *See* Hr'g Tr. at 23:9-21, 24:4-13, 36:21-37:1, 59:11-14. Specifically, the parties agree that under New Jersey (and not Indiana) law, an overly broad non-compete or non-solicitation provision may be narrowed by the Court rather than simply being found to be unenforceable. *Id.*

With respect to LaFlamme's argument that application of New Jersey law will violate "a fundamental public policy *of Indiana*" (Defs.' Opp'n at 16 (emphasis added)), his focus is misplaced. The initial question is whether application of the contractually chosen law (New

Jersey), which provides for more flexibility in enforcing non-compete and non-solicitation clauses, violates *New Jersey* public policy. It does not. *See Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604, 609 (N.J. 2004) ("Although our dissenting colleagues may contend that do-not-compete provisions are, or should be, *per se* illegal, in point of fact, they are not illegal *per se*.). New Jersey courts recognize that "noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable." *Id.* This is true even if some portion of the clause is found to be overly broad. *See Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 900 (N.J. 2005) ("When it is reasonable to do so, courts should not hesitate to partially enforce a restrictive covenant.") (citing *Karlin v. Weinberg*, 390 A.2d 1161, 1168 n.4 (N.J. 1978), and upholding restrictions but narrowing the geographic scope of the restrictions).

With respect to LaFlamme's argument that New Jersey law should not be applied because "Indiana also has a materially greater interest in this litigation than New Jersey," he overstates the facts and minimizes New Jersey's interest in this matter.[6] LaFlamme argues that the "only connection to New Jersey is Chemetall's headquarters." Defs.' Opp'n at 19. In contrast, he argues that the connections to Indiana are great. In support of this position, he states that he is an Indiana resident, "[h]e has always worked in Indiana," "he has serviced his Indiana-based customers from Indiana," "[h]e received and executed the Agreement in Indiana," he "did not report to supervisors in New Jersey," he did not "regularly visit New Jersey on business for Chemetall," and "Chemetall seeks to enjoin LaFlamme from working in Indiana." *Id.* at 18-19. LaFlamme relies on *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802 (S.D. Ind. 2007), in support of his argument that

---

[6] To the extent that LaFlamme argues that, "[p]erhaps most important, there is a pending first-filed action in Indiana before Chief Judge Young that will dispose of the issues in this case" (*see* Defs.' Opp'n at 19), Judge McVicker Lynch answered that question by permitting this Court to address the issues raised by the parties in the first instance—on both the merits and the appropriate forum.

these facts demonstrate that Indiana has a materially greater interest than New Jersey. LaFlamme quotes the following excerpt from *Dearborn*:

> Dearborn is an Indiana resident, and his ability to work here in his chosen field is at issue. Indiana was the center of gravity of his employment relationship with EJP throughout the ten years he worked for EJP. All his positions were in Indiana. He visited Maine only occasionally, perhaps only twice. Apart from a few customers in Michigan, served by the Mishawaka, Indiana office years ago, all the customers and business Dearborn has handled for EJP have been in Indiana. Dearborn's supervisor with EJP is also located in Indiana. Indiana is the site of the activity that EJP seeks to enjoin. Indiana cities, towns, water and sewer systems, and Indiana contractors, are the customers who benefit from vigorous competition in this business. On the other side of the equation, EJP is headquartered in Maine and presumably would benefit there from enforcement of the covenants. On balance, Indiana has a materially greater interest in this litigation than Maine.

Defs.' Opp'n at 19 n.8 (quoting *Dearborn*, 486 F. Supp. 2d at 818).

First, *Dearborn* is a case from an Indiana court that was analyzing the facts under Indiana law construed in accordance with Indiana public policy. *See Dearborn*, 486 F. Supp. 2d at 808-09, 811-15. Second, the facts here do not parallel *Dearborn* or demonstrate that Indiana has a "*materially greater* interest than [New Jersey] in the determination of the particular issue." *See Instructional Sys.*, 614 A.2d at 133 (emphasis added). LaFlamme states that he was "assigned no sales territory at any time with Chemetall." LaFlamme Decl. ¶ 19. He states that his direct supervisor was "based in Cincinnati." *Id.* ¶ 20. He states that only "half of [his] customers are based in Indiana." *Id.* ¶ 18. It is also undisputed that on the same day that Chemetall filed for a TRO in this matter, LaFlamme was visiting GE, a Chemetall client, in Louisville, Kentucky. *See* Dyman Decl. ¶ 4. In addition, his new employer, Coral, is not an Indiana company, nor does it have its principal place of business in Indiana. And, LaFlamme has been assigned no specific territory for his employment at Coral. Thus, even if the Court found *Dearborn* persuasive—which it does not, the facts in this case are distinguishable from the *Dearborn* facts. Unlike in *Dearborn*, Indiana was not "the center of gravity of [LaFlamme's] employment relationship" with Chemetall

(or even Coral), all (or even most) of the customers he served were not in Indiana, his supervisor was not located in Indiana, and Indiana is not the only site of activity that Chemetall seeks to enjoin.  As one example, Chemetall seeks to enjoin LaFlamme from soliciting business from Chemetall's customer who LaFlamme previously served in Kentucky.

Third, LaFlamme understates New Jersey's interest in this matter.  New Jersey has an interest in enforcing its company's rights, in enforcing covenants that are reasonably designed to protect the legitimate interests of its residents,[7] and in protecting the confidential information of its residents.  LaFlamme does not contest that Chemetall is a specialty chemical manufacture with its principal place of business in New Jersey whose business relies on the protection of its trade secrets and other confidential information.[8]  In fact, the eight page Agreement at issue addresses access to and protection of "confidential and trade secret information" *first*, and for four of the eight pages.  LaFlamme Decl., Ex. 1 (Agreement), at 1-2, §§ 1-6.  The Agreement begins by stating that "to ensure that Employee will not compromise the confidentiality of Chemetall confidential information and/or unfairly compete with Chemetall by using confidential information relating to Chemetall customers, their purchasing patterns, discount codes, pricing formulae and other

---

[7] LaFlamme places tremendous emphasis on Indiana's interest in applying its policies with respect to non-competes to cases involving its residents.  This argument ignores New Jersey's equal interest as applied to its residents.  *Cf. Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 166 (3d Cir. 2011) ("The primary element in question before the trial court, and now, is whether Coface is likely to succeed on the merits of its claim that Newton violated the non-compete clause in the Agreement. This depends on whether Delaware law should apply to the Agreement or, as Newton contends, Louisiana law should apply. Under Louisiana law, the non-compete provision would not be enforceable. Under Delaware law, it would be. We agree with the District Court that the Asset Purchase Agreement, including the choice-of-law provision, was voluntarily entered into by both parties and was enforceable.").

[8] LaFlamme contests whether he possesses Chemetall's confidential and proprietary information, but he does not contest that Chemetall—as a company—is one who has an interest in protecting its trade secrets and confidential information.

proprietary information obtained by Employee by virtue of his employment with Chemetall, Employee agrees as follows . . . ." *Id.* at 2 (preamble to the specific restrictions, the next three pages of which deal with confidential information, inventions, and discoveries).

While the Court acknowledges that Indiana has an interest in the matter, its interest is not "materially greater" than that of New Jersey—the state of the parties' contractually agreed to law, and thus the exception does not apply. *See Coface Collections*, 430 F. App'x at 167-68 (analyzing whether Louisiana or Delaware had a greater interest in a non-compete dispute). For these reasons, the Court finds that the contractual choice-of-law provision is enforceable, and New Jersey law applies to this matter.

## IV.   PRELIMINARY INJUNCTION ANALYSIS

### A.   Likelihood of Success on the Merits

Chemetall argues that it is likely to succeed on its claim that LaFlamme breached his non-compete and/or non-solicitation agreements.[9] *See* Pl.'s Mot. at 17-18. "To state a claim for breach of contract, [a party] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).

### 1.   Enforceability of the Agreement

Here, there is no dispute that the parties entered into the Agreement, a written contract. The question is whether the Agreement's non-compete and non-solicitation provisions are unenforceable. "Under New Jersey law, a non-compete will be enforced 'where it [(1)] simply protects the legitimate interests of the employer, [(2)] imposes no undue hardship on the employee,

---

[9] Chemetall brings a tortious interference claim against Coral. *See* Chemetall Compl., Count II. Chemetall has not argued that it is likely to succeed on this claim. Therefore, no continuing restraints against Coral are warranted at this time.

and [(3)] is not injurious to the public.'" *HR Staffing*, 2015 WL 5719655, at *2 (quoting *Solari Indus., Inc., v. Malady*, 264 A.2d 53, 56 (N.J. 1970)); *see also Cmty Hosp.*, 869 A.2d at 897 (applying what is "now known as the *Solari/Whitmyer* test[,] for determining whether a noncompete agreement is unreasonable and therefore unenforceable") (alteration in original). A restrictive agreement will not be enforced "merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Ingersoll–Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988).

In considering the first prong of the test, Chemetall argues that "[t]he purpose of the restrictive covenant here is to protect Chemetall's customer relationships, as well as its proprietary information and competitively sensitive plans and strategies – not to stifle competition." Pl.'s Mot. at 20. New Jersey law is plain that employers have "a legitimate interest in preventing the disclosure of confidential information" as well as protecting customer relationships. *HR Staffing*, 2015 WL 5719655, at *3; *see also Cmty. Hosp.*, 869 A.2d at 897 (legitimate interests include "protecting confidential business information" and customer lists); *Ingersoll–Rand*, 542 A.2d at 893-94 (employers have a legitimate interest "in protecting trade secrets, confidential information, and customer relations," and they may also "have legitimate interests in protecting information that is not a trade secret or proprietary information," such as "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which [an] employee has been 'exposed' and 'enriched' solely due to his employment."); *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971) (employers have "a patently legitimate interest in protecting his trade secrets as well as . . . confidential business information and . . . an equally legitimate interest in protecting . . . customer relationships"); *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789, 794 (N.J.

16

App Div. 1992) ("What rights could Coskey's legitimately protect? The cases principally deal with trade secrets, confidential business information and customer relationships.") (citing New Jersey cases).

LaFlamme appears to believe that such interest is not protectable via an injunction unless Chemetall can specifically show that he has already used confidential information in an inappropriate way. *See* Defs.' Opp'n at 23-24; LaFlamme Decl. ¶¶ 72-77; Dority Decl., ¶¶ 34-39. This Court disagrees. First, Courts have found restrictions enforceable even when there is a showing of potential imminent harm of disclosure of confidential information. In *HR Staffing* the Third Circuit held:

> Butts was privy to confidential information about HR Staffing's initiatives to build relationships with CarePoint's competitors. The fact that these plans were in an early stage of development does not eliminate the harm from disclosure, as interfering with one of the deals could injure HR Staffing, particularly given its then deteriorating relationship with its primary client, CarePoint. The conclusion that Butts "would be in a position to inform CarePoint of . . . HR Staffing's plans and undermine these plans for CarePoint's benefit," was therefore not clearly erroneous, and enforcing Butts' non-compete protects HR Staffing's interest in safeguarding confidential information.

2015 WL 5719655, at *3 (internal citation omitted). Here, Chemetall is a specialty chemical company, and LaFlamme was a *Technical* Sales Manager trained to understand and be able to explain the special nature of Chemetall's products to Chemetall's customers. LaFlamme was privy to confidential information about Chemetall's customers and sales strategies and to information regarding Chemetall's specialized products. Although the Court recognizes that LaFlamme had extensive experience in the industry prior to joining Chemetall, he was not privy to the additional non-public information regarding Chemetall products prior to his employment there. It is this confidential, incremental information specific to Chemetall that Chemetall seeks to protect.

Second, factually, the submissions show that, prior to resigning, LaFlamme was in contact with Coral, and that Coral reviewed his Agreement. Then, after LaFlamme submitted his notice of resignation, Chemetall cut off his access to parts of its network. Despite this, he admits that used USB drives to download Chemetall documents as a work around. Regardless of his purported reason for copying Chemetall's files on to the drives, he does not assert that anyone at Chemetall agreed that such "copying" of its files as a work around to reduced network access was appropriate. LaFlamme then took the USB drives with the Chemetall files with him when he left Chemetall on a Friday, knowing he was starting work with a direct competitor on the following Monday, and the Chemetall files still have not been returned. LaFlamme additionally has shown a willingness to inappropriately use Chemetall property as he does not dispute that he gained access to the plant of one his former Chemetall customers using a Chemetall vendor badge—*while at Coral.* LaFlamme's efforts to put the blame for his actions on Chemetall—for not terminating him immediately upon his resignation and deactivating the badge (*see* Hr'g Tr. at 41:6-11, 64:5-9)— are unpersuasive. LaFlamme's self-serving statements that he will not use any information in the future in an inappropriate way, *see* LaFlamme Decl. ¶¶ 72-77, are unpersuasive in light of these facts.

The Court finds that LaFlamme's behavior raises legitimate concerns by Chemetall regarding the protection of its confidential information. Even the Indiana *Dearborn* court relied on by LaFlamme noted that the company seeking to enforce the restriction (EJP) did "not contend that Dearborn [the employee] removed any documents, records, or materials when he left EJP." *Dearborn*, 86 F. Supp. 2d at 820.

Aside from analyzing whether a protectable interest is at stake, "three additional factors should be considered in determining whether the restrictive covenant is overbroad: its duration,

the geographic limits, and the scope of activities prohibited.  Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *Cmty. Hosp.*, 869 A.2d at 897.  New Jersey courts recognize that restrictive covenants "clearly limit an employee's employment opportunities and in many instances probably interfere with an employee securing a position in which he could most effectively use his skills, at the same time depriving society of a more productive worker." *Ingersoll–Rand*, 542 A.2d at 894. "Accordingly, courts must evaluate the reasonableness of [a restrictive covenant] in light of the individual circumstances of the employer and employee" and "balance the employer's need for protection and the hardship on the employee that may result." *Id.*

Here, the duration of the restrictions—one year—has not been contested, and such durations have been found to be reasonable under New Jersey law.  *See, e.g., Cmty Hosp.*, 869 A.2d at 897-98 (two years reasonable); *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *7 (D.N.J. June 13, 2009) (two years reasonable).  Instead, LaFlamme argues that the Agreement's restrictions are overbroad because: (1) there is no geographical limitation in the terms of the agreement, (2) there is no geographical limitation in the fact that some of Chemetall's customers are global; (3) the scope is too broad as Chemetall seeks to restrict LaFlamme from working at Coral; (4) the scope is too broad as Chemetall seeks to prevent LaFlamme from soliciting customers with which he had a relationship prior to joining Chemetall; and (5) the scope is too broad as Chemetall seeks to prevent LaFlamme from soliciting prospective customers.  The Court addresses each in turn.  As some of these arguments are intertwined with LaFlamme's undue hardships arguments, it will address those arguments together, as well as addressing his more general hardship argument below.

The Court stresses that the following analysis is in the context of Chemetall's application for a preliminary injunction, for which it has the burden.  To be clear, the analysis is not a final ruling on the interpretation of the Agreement.  It is the Court's analysis based on the undisputed facts before it and the information put forward by Chemetall to justify its application.

No Definition of Territory.  The Agreement provides that LaFlamme may not "compete with Chemetall within any territory to which Employee was assigned by Chemetall during the two (2) years prior to the termination of Employee's employment with Chemetall."  LaFlamme Decl., Ex. 1 (Agreement), § 7.  LaFlamme asserts that he "was assigned no sales territory at any time with Chemetall, including my last two years working for Chemetall." *Id.* ¶ 19.  This statement directly contradicts his Offer Letter which stated that he was being hired as a TSM "for the South Central Region," and which tied part of his compensation to the "gross margin dollars [his] territory will generate." *Id.*, Ex. 1 (Offer Letter), at 1.  However, the restriction is limited to the territory served in the last two years of his employment, and there are conflicting declarations on this point.  Mr. Brunner of Chemetall asserts that "LaFlamme was assigned to work in Indiana, Kentucky, Eastern Illinois, and Western Ohio," and that "he *primarily* serviced customers in this geographic territory." Brunner Decl. ¶ 4.  Furthermore, Chemetall acknowledges that "'territory' is not a defined term in the contact," but argues that "it would be given its ordinary and plain meaning." Hr'g Tr. at 12:3-6.  While that may be true, to obtain an injunction (or even to ultimately prevail on this issue), Chemetall has the burden of showing that "territory" has an ascertainable meaning, and it further must explain how imposition of such a territorial boundary does not pose an undue hardship on LaFlamme.  Chemetall has not done so here.  Its statement at the February 29 hearing that once LaFlamme is deposed, "he will know which areas of the country those were" (*id.* at 13:17-18) emphasizes that the question of territory is a disputed fact based on the evidence

before the Court.  Thus, at this stage, Chemetall has presented insufficient evidence for the Court to engage in meaningful review for purposes of issuing an injunction restricting LaFlamme from competing based solely on assigned "territory."

The Global Nature of Chemetall's Customers.  Aside from not competing with Chemetall in any way within a certain territory, the Agreement also restricts LaFlamme "from soliciting customers and prospective customers of Chemetall who have either purchased a Chemetall product in the past two years, or who have been contacted by Chemetall in the past two years."  Pl.'s Mot. at 26 (citing the Agreement § 8, ¶ 2.)  LaFlamme argues that such a provision is overly broad because many of Chemetall's customers are large global companies.  *See* Hr'g Tr. at 22:16-22. Chemetall argues that "[w]hile New Jersey courts seem to require geographic limits for non-compete clauses, geographic limitations do not appear necessary for non-solicitation provisions." Pl.'s Mot. at 26-27.  It further argues that a restriction on solicitation of Chemetall's customers is necessary here to protect its confidential and proprietary information as well as its customer relationships.  Chemetall argues that "LaFlamme was exposed to customer information on a wide variety of accounts, including those with which he did not have a direct relationship," and that "[h]e also attended regional and national sales meetings where TSMs across the country discussed sales made on customer accounts, as well as prospective customers they were targeting in their respective territories and their strategies for landing those accounts."  Brunner Decl. ¶¶ 24-25.  The Court agrees that geographic parameters are not always necessary for the enforcement of a non-solicitation clause.  *See Trico Equip.*, 2009 WL 1687391, at *7 ("While New Jersey courts seem to require geographic limits for non-compete clauses, geographic limitations do not appear necessary for non-solicitation provisions."); *Pathfinder L.L.C. v. Luck*, No. 04-1475, 2005 WL 1206848, at *7 (D.N.J. May 20, 2005) ("[B]ecause the restrictive covenant was limited to clients,

for a limited duration, it is not unreasonable merely because the geographical limits were open-ended."); *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1040 (N.J. Super. Ct. Law Div. 1995) ("[T]he failure to restrict the geographical area is not significant, since the provision essentially sought to protect existing customer relationships rather than a territorial sphere of influence."). However, there still must exist some meaningful way to evaluate the applicable scope and reasonableness of the restriction.

Here, given the technical nature of the products involved, the propriety and confidential information related to the products and customers, and LaFlamme and Coral's actions to date, the Court finds Chemetall's concerns regarding its customers and information legitimate, and finds that non-solicitation restrictions are likely to be found to be enforceable.[10] The issue, however, for purposes of the present injunction application is the appropriate scope of those restrictions.

Chemetall is a global company that "offers 1500 specialized products and systems for more than 30 industries." Dority Decl., Ex. C (Chemetall website excerpt). Chemetall argues that the non-solicitation provision is "reasonably limited in scope" because "the restriction is limited to only those customers who have purchased a Chemetall product in two years preceding his termination." Pl.'s Mot. at 28. LaFlamme asserts that he "serviced fewer than 20 customers during the last two years of [his] employment, sold less than 50 specific Chemetall products, and worked with customers in only four industries." LaFlamme Decl. ¶ 55.   With respect to questions

---

[10] Other than his general arguments against unenforceability of the Agreement's non-solicitation provisions, LaFlamme does not explain why, if it is found to be enforceable, he should not be restrained from soliciting Chemetall's employees. For the same reasons that the Court finds that the non-solicitation provision in general is enforceable, so to does it find the subpart related to Chemetall's employees enforceable.  Therefore, the Court will maintain the injunction with respect to non-solicitation of Chemetall's employees.

regarding the non-compete versus non-solicitation provisions for purposes of an injunction, Chemetall counsel stated the following at the February 29 hearing:

> We certainly don't concede that only a narrower subset of these restrictive covenants are enforceable. We certainly believe that these are fully enforceable, and that is an argument the parties can have in a full fledged litigation. But if the issue today is: Is this guy willing to go out there and solicit a very significant customer absent an injunction, we know the answer, your Honor. He did it. He's doing it. I shouldn't say -- I want to be clear about that. He was doing it up until the day you entered a TRO.

Hr'g Tr. at 20:6-15. The Court agrees with Chemetall, and at a minimum, the Court finds that Chemetall is likely to succeed in proving that the Agreement is enforceable with respect to restricting LaFlamme from soliciting business or assisting others to solicit business from the customers that he served in the last two years while at Chemetall. The Court further finds that absent an order from this Court, LaFlamme will seek to solicit such customers on behalf of Coral.

The more difficult question based on the information before the Court is whether Chemetall is likely to be successful in proving that a broader non-solicitation restriction is enforceable. For purposes of the present motion, the Court finds that Chemetall has not met its burden with respect to such a broader restriction. It is unclear if LaFlamme even knows all of the global customers who have purchased the products he dealt with, much less the other 1450 products that he did not sell. Chemetall has submitted no particularized information for how the pool beyond his direct customers could reasonably be identified,[11] and why the net should stretch so far given that LaFlamme dealt with a small fraction of Chemetall's products.

Saying that, the Court recognizes that LaFlamme is currently working for a direct competitor, and Chemetall's ability to present its argument has been limited by Coral and

---

[11] It may be that ultimately Chemetall will show that he is sufficiently familiar with customer information for a larger but defined subset of Chemetall's customers, but at this point no such information has been presented to the Court.

LaFlamme's actions.   First, Coral's counsel is representing LaFlamme.   And, Coral's general counsel has taken the position that Chemetall must disclose its customer list to Coral in order to justify restrictions on non-solicitation.   The Court disagrees.   Coral cannot negotiate with a Chemetall employee while he is still at Chemetall, review his contractually agreed-to restrictions (*see* Cona Decl. ¶ 9 (Coral reviewed LaFlamme's Agreement prior to his resignation); *see also* Dority Decl. ¶ 11), advise him that they will not be enforceable at all (which Mr. Shupenus' letter makes clear), represent him, demand that Chemetall customer lists be provided *to Coral* (*see* Dority Decl., Ex. O, Email from Mr. Shupenus to Mr. Steiner, dated Feb. 16, 2016 (demanding Chemetall's customer list for *Coral* to "understand the scope of the TRO")), when such information is not provided from Chemetall, argue that the provision is too undefined, and then further argue hardship on the employee because Coral may fire him for a gamble they took together.   Counsel for LaFlamme at the February 29 hearing acknowledged that Coral has no standing on LaFlamme's contract claim.   *See* Hr'g Tr. at 21:4-8.   Despite this, Coral's general counsel, not LaFlamme, attended the hearing.   Thus, the Court does not require that Chemetall produce a customer list to support its position, but it must at least better support the basis for its position that it will likely prove that a broader restriction is enforceable.

Second, Coral's counsel and/or Coral are holding the USB drives containing the Chemetall information copied by LaFlamme.   *See* Hr'g Tr. at 41:8-20 (Coral's counsel using the term "we" with respect to possession of the drives).   Without a review of the drives, Chemetall is limited in knowing exactly what information LaFlamme copied and removed from Chemetall.   If LaFlamme copied and removed information related to customers beyond those he served, or if he removed technical, non-public information about products, then Chemetall may have been able to more narrowly identify the risk, harm posed, and boundary designed to protect that interest.

For these reasons, for non-solicitation of Chemetall's clients, given the high burden for an injunction and the information before the Court at this time, the Court finds that Chemetall is likely to succeed in proving that a restriction on soliciting or assisting others to solicit the Chemetall customers he served in the last two years is reasonable is scope. However, while the Court finds that the specialized nature of Chemetall's products and/or the confidential information involved[12] likely supports a broader customer solicitation restriction than this, it also finds that a restriction pertaining to all of Chemetall's global customers and products is too broad. Chemetall has presented no information from which the Court is able to draw a reasonable line within that range. This decision is without prejudice to Chemetall to seek to expand the injunction if, after receiving the USB drives (as discussed more fully below), it believes that more particularized, but broader, restrictions are necessary.

Employment at Coral. While Chemetall's demand letters to LaFlamme and Coral did indicate that LaFlamme should cease working at Coral (see Brunner Decl., Exs. D, E), that relief was not sought as part of Chemetall's present motion. Therefore, the Court finds that this issue is moot.

Prior Relationships. LaFlamme argues that, under New Jersey law, "[w]hat an employee brings to his employer, he should be able to take away." Defs.' Mot. at 26 (citing Coskey's Television, 602 A.2d at 637-38, and Meadox Meds., Inc. v. Life Sys., Inc., 3 F. Supp. 2d 549 (D.N.J. 1998)); Intarome Fragrance & Flavor Corp. v. Zarkades, No. 07-873, 2007 WL 979882, at *9 (D.N.J. Mar. 29, 2007). While this is true, New Jersey law further provides that a company may

---

[12] To the extent that LaFlamme tries to argue or imply that there is no issue of confidential information, such an assertion is not credible. He may argue that nothing on the drives was confidential (which Chemetall has been unable to review and confirm), but the Agreement and nature of Chemetall's business make clear that Chemetall's business involves protectable confidential information.

protect relationships that it, "either directly or indirectly, assist[ed] in developing." *Meadox Meds.*, 3 F. Supp. 2d at 553. Thus, where the customer relationship was developed "solely through [the employee's] own efforts and expenses," "[t]he fruits of that labor are not proprietary to the new company." *Id.* But, where the company assisted in further developing the relationship, such an interest is protectable. *Id.* This is particularly true when it is not simply the skill of the employee that is involved in the customer relationship but also knowledge of the company's proprietary and specialized products that are being sold.

Here, "one of [LaFlamme's] first important tasks [for his employment at Chemetall was] the learning of the superior Chemetall line of products." LaFlamme Decl., Ex. 1 (Offer Letter), at 1. The issue then is not simply a customer relationship, but also the specialized knowledge that Chemetall provided to LaFlamme related to its products that LaFlamme has used for the past five years to further develop and maintain those relationships. The Court finds that, even had LaFlamme made an attempt to show which customers he had a relationship with prior to his employment with Chemetall—which he did not, it is likely that Chemetall will be able to show that it assisted in further developing any such relationships over the past five years of LaFlamme's employment with Chemetall.

<u>Prospective Customers</u>. For the same reasons that the Court found that a non-solicitation restriction related to any Chemetall customer was too broad based on the information before the Court, so too does the Court find that a restriction related to non-solicitation of any prospective customers is also too broad. *See ADP LLC v. Jacobs*, No. 15-3710, 2015 WL 4670805, at *5 (D.N.J. Aug. 5, 2015). The Court will enjoin LaFlamme from soliciting prospective Chemetall customers that he contacted on behalf of Chemetall in the two years prior to his departure. But, Chemetall has presented insufficient evidence for purposes of this motion to find that it will

succeed in proving that a broader restriction related to prospective Chemetall customers will be enforceable.  As with the solicitation of Chemetall's current customers, however, this decision is without prejudice to Chemetall to move to modify the injunction after a review of the USB drives.

Aside from the above specific arguments, LaFlamme more broadly argues that any restrictions imposed on him will impose an undue hardship on him because he may be terminated from Coral.  *See* Defs.' Opp'n at 35. He further argues that arguments that his position is "self-inflicted" is "painful" as it was Chemetall who forced him out of the company.  *See* LaFlamme Decl. ¶¶ 21-23.  Under New Jersey law, "the restrictive covenant [must] impose no undue hardship on the employee." *Cmty. Hosp.*, 869 A.2d at 898.  The New Jersey Supreme Court has stated:

> In applying this part of the test, the reason for the termination of the parties' relationship is also relevant. If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play. On the other hand, where the employer causes the parties to separate, "enforcement of the covenant may cause hardship on the employee which may fairly be characterized as 'undue' in that the employee has not, by his conduct, contributed to it."

*Id.*  It is undisputed that LaFlamme resigned from Chemetall.  Even assuming that he felt that leaving was justified because his compensation was reduced (as discussed in more detail below), he has not shown how the above narrower restrictions place an undue burden on him.  He also ignores the impact of his and Coral's actions.  As Chemetall argues, LaFlamme and Coral gambled here—they "doubled down" on their position that the Agreement would not be enforceable at all. And it is this gamble that put him in the position he is in today.

LaFlamme executed a written agreement with Chemetall wherein he agreed to certain restrictions and a choice of law and forum in favor or New Jersey.  Prior to leaving Chemetall he provided Coral with information regarding his contractual restrictions; he was offered employment by a company knowing of these restrictions; he accepted employment with a direct competitor

knowing of the restrictions; he made no attempt to carve out exceptions to the Agreement or negotiate with Chemetall prior to violating the terms of Agreement if he felt that Chemetall's actions invalidated the Agreement (i.e. he sought to test the terms through violation rather than through discussions with Chemetall);[13] he was informed less than one week after leaving Chemetall of Chemetall's position that he was breaching his agreement; and, again, he made no effort to negotiate with Chemetall. Instead, his position has been that the Agreement was not enforceable at all, and he has acted based on that assumption. To this end, only two weeks after leaving Chemetall (and a day after Chemetall sent a copy of its TRO application papers to Coral), LaFlamme visited his former Chemetall customer on behalf of Coral. Coral knew that restrictions on such behavior are widely protectable[14] but was gambling that it could have an Indiana court review the issue (contrary to the forum selection clause), and then that court would disregard the terms of the Agreement and apply Indiana law (that recognizes such rights as reasonable, but will not allow overly broad agreements to be so reformed). LaFlamme clearly addressed these issues with Coral prior to leaving Chemetall. *See* Cona Decl. ¶ 9 (Coral reviewed LaFlamme's Agreement prior to his resignation); *see also* Dority Decl. ¶ 11.

Despite these facts, LaFlamme's counsel argued that he was not "doubling down." Hr'g Tr. at 20:23-25. His counsel asserted that "[a]ll he was doing was his job that he was hired to do." *Id.* Coupled with LaFlamme's immediate visit to a Chemetall customer, this implies that LaFlamme was hired by Coral to solicit his Chemetall customers despite his Agreement, assuming that the Agreement would not be enforceable at all. Coral and LaFlamme cannot self-generate

---

[13] He has a right to do this, but he bears the risk if he is wrong.

[14] *See, e.g., Dearborn*, 486 F. Supp. 2d at 809 ("[T]he narrower relief that EJP seeks in court probably would be reasonable under Indiana law because the geographic and customer limits would be tied to Dearborn's own duties.").

hardship by arguing that he may be terminated (*see* Hr'g Tr. at 28:10-23) because this gamble did not turn out as planned. *See HR Staffing*, 2015 WL 5719655, at *3 ("Butts left HR Staffing and joined CarePoint knowing that he was subject to a non-compete agreement that HR Staffing refused to waive. Hence, to the extent this placement has caused 'hardship,' he 'brought any hardship upon himself.'") (quoting *Cmty. Hosp.*, 869 A.2d at 895).

The Court is presently restricting LaFlamme from soliciting (or assisting with the solicitation of) only his Chemetall customers for the two years prior to the end of his employment with Chemetall. LaFlamme made no arguments for how such a restriction is unreasonable even after the Court specifically questioned Chemetall about narrower restrictions. For these reasons, the Court finds that the non-solicitation clause as narrowed will not place an undue hardship on LaFlamme.

The final prong of the test is that enforcement of the restriction should not cause harm to the public. *Cmty. Hosp.*, 869 A.2d at 898. LaFlamme makes no argument for how the restriction as narrowed harms the public interest. His primary argument is that restrictions on him are against Indiana public policy. His second argument is that the customers he served should be able to be served by the salesmen of their choice. The Court finds such arguments unpersuasive as it misplaces the focus of the test. *See, e.g., Trico Equip.*, 2009 WL 1687391, at * 8 ("To the extent that the public interest is considered in cases not involving licensed professionals, courts consider the demand for services offered by the employee and the likelihood that those services can be provided by others working in the area. Here, there are other sales people who can provide these services in Virginia.") (internal citation omitted); *Pathfinder*, 2005 WL 1206848, *8 ("[C]onsulting in the chemical process industry cannot be held to the same level of 'importance' as the public's access to qualified doctors.").

For these reasons, the Court finds that Chemetall is likely to succeed in proving that a restriction against LaFlamme from soliciting or assisting with the solicitation of the Chemetall customers he served in his last two years of employment will be enforceable.[15]

### 2.    Prior breach

LaFlamme argues that Chemetall cannot show likely success on the merits because it will not be able to show that it performed its own contractual obligations under the Agreement. *See* Defs.' Opp'n at 20. LaFlamme asserts that "Chemetall unilaterally halved LaFlamme's compensation without his consent on January 1, 2016, thereby violating the 'reasonable degree of income protection' accepted by LaFlamme when he executed the Agreement." *Id.* The Offer Letter provides:

> **(E) RESTRICTIONS**
> The company reserves the right to discontinue, change or otherwise modify existing arrangements made with a Technical Sales Representative. Whenever such changes are contemplated, the balanced interests of the Company and the Technical Sales Representative will be taken into consideration to insure a high level of customer service, profitability of operations and a reasonable degree of income protection.

LaFlamme Decl., Ex. 1 (Offer Letter), at ¶ E. LaFlamme has not claimed that any compensation reduction was targeted at him. He "was told at a group meeting of Chemetall top sales representatives that, effective January 1, 2016, Chemetall would . . . impose a 'new' compensation formula." *Id.* ¶ 21. Without providing any other details, LaFlamme asserts that this new formula would reduce his compensation by 40%. *Id.* LaFlamme's compensation, at least initially, was composed of base salary and a portion tied to the gross margin in his territory. *Id.*, Ex. 1 (Offer

---

[15] LaFlamme argues that "[a] preliminary injunction should not issue where material facts are in dispute." Defs.' Opp'n at 28. While there may be facts in dispute, the Court based its decision on the undisputed facts presented by the parties. To this end, the restrictions were narrowly tailored.

Letter), ¶ A. LaFlamme does not provide what his compensation was in December 2015, which portion was being reduced, and how it would be reduced. He provides no information related to the change in the company's formula affecting a group of Chemetall employees. Most importantly, he does not address the fact that the language he cites is but one factor the company will *consider*, and it was in a section entitled "Restrictions" that provided Chemetall the right to change or modify the arrangements. The bare assertions submitted by LaFlamme as compared to the plain language of the Offer Letter are insufficient at this stage to defeat Chemetall's position that it had performed its obligations under the Agreement.

### B.    Irreparable Harm

To warrant the issuance of an injunction, "[a] plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (internal quotations omitted). Chemetall argues that "[c]ourts in this district routinely find that the sort of intangible which is being impaired here, *i.e.* the loss of goodwill, threatened disclosure of trade secrets, customer and confidential information, is not economic loss that can be fully compensated by a damage award and thus can only be prevented by injunctive relief." Pl.'s Mot. at 35. LaFlamme, on the other hand, argues that "Chemetall offers nothing more than hearsay and 'information and belief' that it will be harmed if LaFlamme works for Coral in any capacity." Defs.' Opp'n at 30. He further argues that "Chemetall presented nothing more than speculation . . . to even suggest a risk that LaFlamme would deliberately disclose Chemetall's confidential information to Coral." *Id.* at 32. The Court disagrees.

First, an imminent possibility of disclosure of confidential information is sufficient to support a finding of irreparable harm. *See, e.g., HR Staffing*, 2015 WL 5719655, at *4 ("Butts argues that there was no evidence that he imminently planned to disclose confidential information

. . . . Here, Butts left HR Staffing and 'transferred his loyalties to CarePoint, and could be willing to disclose damaging information or, at the very least, allow the information to influence his actions at CarePoint to the detriment of HR Staffing, especially considering his belief that HR Staffing was using him as a pawn in its dispute with CarePoint.") (citing *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 530 A.2d 31, 33 (N.J. App. Div. 1987)); *see also Trico Equip.*, 2009 WL 1687391, at * 9 ("Manor has contacted his former customers and will continue to do so unless restrained. He (and Skyworks) benefit from the confidential information he learned working for Trico. There is no monetary compensation that can adequately measure their loss.").

Second, Chemetall's concern is not only that LaFlamme may share its confidential information with Coral, but also that he may use such information in soliciting Chemetall customers. Third, and most importantly, LaFlamme and Coral's actions demonstrate that such fears are not unreasonable. Knowing that Chemetall blocked him from accessing a portion of the company network after his resignation, he copied Chemetall files onto USB drives. He took those copied files with him after he left. The copied files have not been returned and are presently in the hands of his and *Coral's* counsel. Furthermore, within two weeks of leaving Chemetall, knowing that Chemetall disputed his position with respect to the enforceability of the Agreement (and on the day after Chemetall sent notice of its intention to seek a TRO to Coral), he visited his prior Chemetall customer, and he used Chemetall property to access the customer's plant. And, finally, he and Coral have made clear that they will proceed—absent court order—as if there is *no* agreement. His self-serving statements that he will safeguard Chemetall's confidential information despite this behavior is not persuasive.

For these reasons, the Court concludes that Chemetall has established a likelihood of irreparable harm absent an injunction.

### C.   Balance of Equities

Chemetall argues that "Defendants will not be harmed by an injunction. In effect, an injunction will simply mandate that LaFlamme comply with the terms of the Agreements he already signed." Pl.'s Mot. at 36. LaFlamme, on the other hand, argues that "Chemetall will suffer no harm absent the injunction it seeks, absent the possibility of monetary damages due to as-yet unidentified lost profit." Defs.' Opp'n at 35. He further argues that an injunction, however, "preventing [him] from working for Coral will cause him to lose his family's sole source of income for a year because he has no indemnification agreement guaranteeing his continued compensation during any period of restriction." Id. Chemetall has not asked, and this Court is not granting, an injunction restraining LaFlamme from working for Coral in any capacity. Therefore, his argument is moot.

For all the reasons discussed above, the Court finds that Chemetall's interests in protecting its customer relationships and confidential information outweigh the narrow restrictions placed on LaFlamme. To the extent that he may lose his job if he is not able to solicit his prior Chemetall customers for one year (which no one has argued), that is an outcome that stems from a risk that was known to both him and Coral prior to him leaving Chemetall. See HR Staffing, 2015 WL 5719655, at *5 ("Furthermore, where, as here, the employee willfully breach[ed] a valid restrictive covenant, the harm to [him] is a predictable consequence of [his] willful breach and . . . is not the type of harm from which we seek to protect [him].") (alteration in original, internal quotations omitted).

### D.   Public Interest

Chemetall argues that "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business

and employment relationships." Pl.'s Mot. at 38 (quoting *Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999)); *see also HR Staffing*, 2015 WL 5719655, at *5 ("While the public interest factor is not satisfied simply because enforcement of a contract provision is generally a good thing, we nevertheless agree that the public at large can be expected to gain from the enforcement of non-competes that make it possible for staffing agencies to continue performing their services for both employees and employers.") (internal citations and quotations omitted). Chemetall further notes that "[t]here are other salesman in the chemical surface treatment industry who can sell the same products in LaFlamme's former territory." Pl.'s Mot. at 38. On the other hand, LaFlamme argues that "[e]nforcement of a draconian non-compete and non-solicitation agreement against an Indiana resident violates a fundamental public policy of Indiana." Defs.' Opp'n at 36. He further argues that, "post-employment restraints which fail to protect the legitimate business concerns of an employer, or serve no purpose other than to stop a former employee from engaging in his chosen profession, violate New Jersey's strong public policy against restraint of trade and in favor of free enterprise." *Id.*

The Court agrees with Chemetall, and, for the reasons discussed above, finds that restricting LaFlamme as identified herein is not against the public interest.

## E.   Confidential Information

Finally, the Court addresses protection of Chemetall's confidential information and the USB drives. First, LaFlamme's counsel acknowledged that LaFlamme cannot use Chemetall's confidential information, it is appropriate to enter an order to that effect, and LaFlamme will return the drives if so ordered. *See* Hr'g Tr. at 42:1-7. The Court makes clear that not only may LaFlamme not share Chemetall's confidential information with Coral, he may not use it or share it at all. Based on the filings and arguments related to the present motion, the Court anticipates

that LaFlamme and Chemetall may disagree on what information is Chemetall's proprietary and/or confidential information and what information LaFlamme possesses as a result of his prior experience, knowledge of the industry, and other public information. Given LaFlamme's actions to date, the Court notes that, when there is doubt and he proceeds anyway, he does so at his own risk.

Second, LaFlamme's counsel (who is also Coral's counsel), Mark Saloman (a New Jersey attorney), has indicated that "we" have possession of the USB drives, and asserts that "we" have not returned them because they are unsure if LaFlamme added new Coral confidential information to the drives. Hr'g Tr. at 42:18-25, 65:3-5. He also stated that he wants to preserve a copy of the drives for purposes of the litigation. *See id.* at 42:23-25. Mr. Saloman indicated that "before we turn it over, we may need to analyze it to make sure that we are not giving to Chemetall confidential information that belonged to Coral," implying that someone may delete files before turning the drives over to Chemetall. *Id.* at 65:3-5. No one is permitted to alter the drives for any reason without prior Court permission, except as provided herein. The Court instructs the parties as follows with respect to the USB drives:

- The original USB drives (not copies) are to be turned over to Chemetall counsel within 24 hours of issuance of this Opinion;

- Prior to turning over the drives, Mr. Saloman may make a copy of the drives for preservation purposes;

- When the drives are turned over to Chemetall's counsel, Mr. Saloman shall identify who the "we" is that has had possession of the drives at any time since LaFlamme's last day at Chemetall;

- After receiving the drives from Coral's counsel, Chemetall's counsel is instructed to not disclose the information contained on the drives to Chemetall;

- Mr. Saloman and counsel for Chemetall are to meet and confer as soon as possible to determine which, if any, files should be removed from the drives before being turned over to Chemetall;

- If counsel cannot reach agreement on which, if any, files should be removed from the drives, they are directed to Magistrate Judge Dickson for resolution of that dispute;

- After resolution is reached and any agreed files are removed, counsel for Chemetall may turn the drives over to Chemetall;

- The information on the copied drives retained by Coral's and LaFlamme's outside counsel (apart from the information agreed by the parties to be Coral's) shall not be disclosed to Coral for any reason, absent prior permission of the Court; and finally

- This process should be undertaken quickly, and undue delays will not be viewed favorably by the Court in light of the fact that Chemetall was required to make the present motion without the benefit of reviewing the Chemetall files that LaFlamme copied and took upon his departure.

## V.   CONCLUSION

For the reasons set forth above, Chemetall's motion for a preliminary injunction is granted subject to the limitations identified herein.  An appropriate Order accompanies this Opinion.

DATED: March 8, 2016

JOSE L. LINARES
U.S. DISTRICT JUDGE